DMP:FJN/CEB
F.# 2020R01107

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF (a) A BEIGE WITH GOLD TRIM APPLE IPHONE 12 PRO MAX IN BLACK CASE, MODEL A2342, IMEI 353167661065250 AND (b) A GRAY APPLE IPHONE 11 PRO MAX, MODEL A2161, IMEI 3528471116944384, CURRENTLY IN THE CUSTODY OF THE FEDERAL BUREAU OF INVESTIGATION | **APPLICATION FOR A SEARCH WARRANT FOR TWO ELECTRONIC DEVICES**<br><br>Case No. 21-mj-780 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, DAVIDE M. GOMES, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of a renewed application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B. This application was presented to the Honorable Vera M. Scanlon on July 1, 2021, and Judge Scanlon issued an order granting the application in part and denying it in part without prejudice to renewal.  See Case No. 21-MC-280-PK.

2.      I am a Task Force Officer with the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force and have been since November 2019.  I am also a Detective with the New York City Police Department ("NYPD") and have been since January 2017.  I have

1

participated in investigations involving firearms and the execution of search warrants for premises, electronic devices, and electronic accounts, including social media accounts.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their actions from detection by law enforcement.

3.      I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: my personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel.  Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

4.      The FBI is investigating violations of Title 18, United States Code, Section 922(g)(1) (possession of firearm by convicted felon) (the "SUBJECT OFFENSE") committed by SHERMAINE LASTER ("LASTER").  On or about June 23, 2021, the Honorable Renee Toliver, United States Magistrate Judge for the Northern District of Texas, signed a criminal complaint and arrest warrant charging LASTER with possessing a firearm on or about October 24, 2020, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  On June 25, 2021, LASTER was arrested at John F. Kennedy International Airport ("JFK").  At the time of his arrest, LASTER had two cellular telephones in his possession.  The applied for warrant would authorize the search of the cellular telephones for evidence of the SUBJECT OFFENSE as well other information set forth in more detail in Attachment B.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.     The property to be searched are (a) a beige with gold trim Apple iPhone 12 Pro Max in black case, model A2342, IMEI 353167661065250 and (b) a gray Apple iPhone 11 Pro Max, Model A2161, IMEI 3528471116944384 (hereinafter the "DEVICES")  The DEVICES are currently in FBI's custody in the Eastern District of New York.

7.     The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A.  Shermaine Laster

8.     LASTER is a 45-year-old U.S. citizen who resides in Brooklyn, New York.  As explained in more detail below, LASTER is a convicted felon and there is probable cause to believe that LASTER has been in recent possession of firearms in New York, Texas, and elsewhere, in violation of federal law prohibiting felons from possessing firearms.

### B.  The Investigation Establishes That Laster Has Illegally Possessed Firearms on Multiple Occasions Since October 2020

9.     On or about October 1, 2020, the NYPD learned that an individual had posted photographs of firearms to Instagram using the username @ourlivesmatternyc (the "Instagram Account").  Records obtained from Instagram indicate that the Instagram Account is registered to an individual named "Big Mike" and that the account is connected to telephone number (718) 536-9415 (the "9415 Number").  As described below, LASTER has identified the 9415 Number as his.

3

10.    Law enforcement officers reviewed publicly available postings on the Instagram Account and observed the following:

a.    A photograph of a dark-colored handgun next to two remote controls on what appears to be a couch.  The user of the Instagram Account captioned the photograph, "Sitting watching TV smoking my cigar!  I'm ready for WAR!!!!!" The image posted by the user of the Instagram Account is below.



b.    A photograph of multiple handguns.  The user of the Instagram Account captioned the image, "No games!!! Proud boys, KKK, skin heads, white supremacy I'm not playing absolutely NO GAMES with your kind!!  I just wish

4

MY ppl wake up and unity before it's too late.  (Black toys) good to fight in the

dark!!"  The image posted by the user of the Instagram Account is below.



c.  A photograph of multiple handguns.  The user of the Instagram Account

captioned the photograph, "Black Power!"  The image posted by the user of the

Instagram Account is below.



11.    On or about October 24, 2020, the user of the Instagram Account posted multiple

photographs and videos of an individual holding and shooting firearms.  Some of the images and

videos on the Instagram Account depicted the individual firing an assault rifle and a handgun at

what appears to be a shooting range, including the following:

       a.    Two photographs depicting an individual holding what appear to be an assault

          rifle and a handgun.  The user of the Instagram Account captioned the

          photographs, "Get ready ppl!!!!  WAR is coming!!!  Brought my baby out and

          connected with big boy AK-47 AR-15 #stopsingingandstartswinging

          #outlivesmatter #fight #war #black #revolution #itson #justice #free #equality."

The images posted by the user of the Instagram Account also depict the individual wearing a dark-colored New York Yankees baseball cap, a dark-colored bandanna and a light-colored t-shirt bearing the message, "I CAN'T BREATHE."





b. Two videos depicting the same individual firing what appears to be the same assault rifle and a handgun at paper targets.  In one of the videos, the individual states, "now I'm going to be demonstrating how to take out your opponent."  A screenshot from one of the videos is below.



12.     Based on information in one of the videos posted, law enforcement officers were able to determine that the photographs and videos were taken at a gun range in Dallas, Texas (the "Gun Range") on or about October 24, 2020.  Specifically, one of the paper targets in the videos bears a logo in the shape of the Texas and bears the name of the Gun Range.

13.     Law enforcement officers contacted the Gun Range and learned that LASTER visited the Gun Range on or about October 24, 2020 and fired the weapons depicted in the photographs and videos.  The Gun Range provided the FBI with a "Firearms Eligibility Experience & Range Safety Waiver" that LASTER signed on or about October 24, 2020, prior to using the facilities at the Gun Range.  The waiver form states, among other things, "[i]t is unlawful for a felon or illegal alien to possess or rent firearms or ammunition."  LASTER checked a box on the waiver form stating, "I agree."  The waiver form also asked LASTER,

"Have you ever been convicted of a felony?"  LASTER responded, "No" on the waiver form.  In addition to answering the above-described questions, LASTER provided the Gun Range with his home address in Brooklyn, New York.  LASTER also provided the Gun Range with information from his New York state identification card, an e-mail address, and a telephone number, which was the 9415 Number.

14.      The Gun Range provided the FBI with photographs of LASTER, which were taken as he signed the waiver form.  The Gun Range also identified that one of the firearms that LASTER fired at the range on or about October 24, 2020 was a Nodak Spud LLC, Model NDS-3, 7.62x39 caliber rifle.

15.      I have compared the photographs of the individual possessing firearms in the above-described photographs and videos to known photographs of LASTER, including LASTER's New York State identification card, and determined that LASTER appears to be the individual depicted in the photographs.

16.      Additionally, law enforcement officers obtained airline travel records for LASTER indicating that he traveled from New York City to Dallas, Texas from on or about October 23 to on or about October 26, 2020.

17.      On or about November 23, 2020, law enforcement officials observed that the user of the Instagram Account publicly posted additional photographs of LASTER in possession of additional firearms on the Instagram Account, as follows:

       a.      A photograph that depicts LASTER holding what appears to be a dark-colored Smith & Wesson AR-15 assault rifle with a telescope.  In the photograph LASTER is wearing a dark-colored cap with the Brooklyn Nets logo and a light-

colored t-shirt with a teddy bear on it.  The image posted by the user of the

Instagram Account is below.



b.  A photograph that depicts LASTER holding a handgun inside what appears to be an automobile.  In the photograph, LASTER is wearing the same dark-colored Brooklyn Nets hat and gray teddy bear t-shirt.  The image posted by the user of the Instagram Account is below:



c.  Two photographs that depict LASTER holding a rifle with what appears to be a sniper-like telescope.  In these photographs LASTER is again wearing the same dark-colored Brooklyn Nets cap and light-colored teddy bear t-shirt described above.  The images posted by the user of the Instagram Account are below:

11

 

d.  An image that depicts LASTER standing outdoors holding a dark-colored assault rifle wearing the dark-colored Brooklyn Nets cap and the light-colored teddy bear t-shirt.  The user of the Instagram Account captioned the image, "I am ready for war!!!!  Just trying to figure out who I am at WAR with.  #leadership #hate #haters #justice #vengeance #serious #nogames #world #loveyourself."  The image posted by the user of the Instagram Account is below.



e.  An image that depicts LASTER standing outdoors in the same location holding

two dark-colored assault rifles wearing the dark-colored Brooklyn Nets cap and

the light-colored teddy bear t-shirt.  The user of the Instagram Account captioned

the image,

When 'they' light I be quiet.!!  When "they" bring lies to try to
destroy my name I be quiet!!  When I strike back I'm not for black
lives, when I stand as a man, I'm not for black lives, when I strike
back because of lies with no facts, I'm then violent and aggressive.
I am about to shut this movement down in NYC until we get rid of
all the fakes, liars, snitch, bullies, who have been messing this
movement up!!!  Serving notice right now, take it how you want,
but I have my list and don't run to the police when this crap get
addressed, when fighting to abolish a system or gain freedom we are
gonna have ppl tho feel thye need to stop the mass from pushing
forward.  I will not be moved!!  Those who troll I know who you
are, those who say "I don't have nothing to do with it" I know who
you are, quit playing with grown men."

13

An image of the photograph posted by the user of the Instagram

Account is below.



18.     Law enforcement officers obtained airline travel records for LASTER indicating

that he traveled from New York City to Augusta, Georgia from on or about November 22, 2020.

19.     On or about December 4, 2020, law enforcement observed a video publicly posted

on the Instagram Account in which LASTER is depicted sitting in what appears to be the interior

of a home.  Ruffled, green colored drapes are visible in the background behind LASTER, as well

as what appears to be a blanket with stripes of multiple colors.  The sound of gunshots can be

14

heard on the video.  After the gunshots, LASTER is depicted on the video looking out the window with a handgun in his hand.  The video is captioned, "How you react when you hear gun shots!"  Based on my review of the video, it appears to have been initially posted on TikTok, which is a social media application that permits users to upload short videos.  The video bears markings (which can be seen in the screenshots below) indicating that it was posted on a TikTok account called @lastermike ("TikTok Account 1").  In addition, as noted above, the Instagram Account is registered in the name "Big Mike."  Screenshots from the video are posted below"





20.     In or about April 2021, the NYPD received a citizen complaint against LASTER from an individual (the "Complainant").  The Complainant stated that beginning in December 2020, LASTER, who the Complainant also knew as "Big Mike," had threatened to kill the Complainant for having filed a sexual abuse complaint against him.  Specifically, the Complainant reported that LASTER sent the Complainant multiple pictures of himself holding several firearms and then called the Complainant to threaten to kill her.  The Complainant further reported that on or about April 15, 2021, LASTER called the Complainant and stated, in sum and substance, "I'm going to kill you bitch.  Your head soon will be on a platter."  The Complainant also reported that on or about April 21, 2021, LASTER called her and stated, in sum and substance, "Yeah bitch I'm outside, I have that AR I'm gonna knock your head off your neck."  Based on my training and experience, an "AR" refers to an AR-15 assault rifle.  Based on my

knowledge of the investigation, I know that the Complainant resides in the Eastern District of New York.  Therefore, when LASTER told the Complainant that he was "outside" with an "AR," I believe that LASTER was indicating to the Complainant that he was in possession of an assault rifle outside her home in the Eastern District of New York.

21.   The Complainant provided the NYPD with copies of the images that LASTER sent to the Complainant.  The images depict LASTER holding firearms.  Some of the images indicate that the photographs were posted to a TikTok account bearing the username @bigmike0626 ("TikTok Account 2").  Images of the photographs are below:








22.     I have reviewed Certificates of Disposition obtained from Kings County Supreme Court.  These documents reveal, among other things, that LASTER was convicted on or about April 28, 2000, for criminal possession of a weapon in the second degree, in violation of New York Penal Law § 265.03, which is punishable by more than one year of imprisonment. LASTER was sentenced to 42 months' imprisonment for this offense.  The documents further reveal, among other things, that LASTER was convicted on or about May 18, 1999, for robbery in the third degree, in violation of New York Penal Law § 160.05, which is punishable by more than one year of imprisonment.

C. **Probable Cause to Search the DEVICES**

23.    Based on my training and experience, Instagram and TikTok are both social media applications that are normally accessed via cellular telephones like the DEVICES. Instagram and TikTok both permit their users to upload photographs and videos from cellular telephones to the websites.  In some instances, the photographs and videos contain metadata indicating where and when the photographs were taken and/or uploaded.

24.    On or about June 23, 2021, the Honorable Lois Bloom, United States Magistrate Judge for the Eastern District of New York signed a search warrant authorizing the FBI to search LASTER's home in Brooklyn for, among other things, cellular telephones belonging to LASTER.

25.    As noted above, on or about June 25, 2021, LASTER was arrested at JFK – where he was scheduled to travel on a flight to Miami, Florida – on the criminal complaint issued out of the Northern District of Texas.  At the time of his arrest, LASTER had two cellular telephones in his possession.

26.    I respectfully submit that there is probable cause that the DEVICES contain evidence of LASTER's illegal possession of firearms.  Specifically, I know that LASTER used a cellular telephone to send photographs of him possessing firearms to the Complainant. Additionally, a cellular telephone is the usual means to upload photographs to Instagram and TikTok.  Therefore, there is probable cause to believe that LASTER used the DEVICES to upload the images described herein to Instagram and TikTok.  As a result, there is probable cause to believe that the DEVICES contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSE.

20

27.    The DEVICES are currently in FBI's custody in the Eastern District of New York.  In my training and experience, I know that the DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICES first came into the FBI's possession.

28.    Based on the foregoing, I respectfully submit there is probable cause to believe that LASTER engaged in the SUBJECT OFFENSE and that the following evidence of the SUBJECT OFFENSE is likely to be found on the DEVICES:

    a.    Evidence, fruits, and instrumentalities of the SUBJECT OFFENSE;

    b.    Evidence concerning the identity of the owner(s) or user(s) of the DEVICES;

    c.    Evidence of firearm or ammunition possession or ownership;

    d.    All communications including telephone logs, text messages, messages sent through applications, and emails regarding firearms or ammunition;

    e.    Photographs, including still photographs, digital images, videos, films, location data, or other items indicating possession of firearms or ammunition by LASTER;

    f.    Any internet or browser entries or history relating to the SUBJECT OFFENSE; and

    g.    Any memory cards associated with the DEVICES, which may contain any and all of the above-referenced forms of evidence of the SUBJECT OFFENSE.

    h.    Any location data indicating the location of the DEVICES from September 2020 to June 24, 2021.

## TECHNICAL TERMS

29.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.

22

This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook, that is primarily operated by touching the screen.  Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets

typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those

functions.  Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30.     Based on my training, experience, and research, I know that the DEVICES have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs.  In my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

32.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICES were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the DEVICES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

26

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how the DEVICES were used, the purpose of their use, who used them, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICES to human inspection in order to determine whether the contain evidence described by the warrant.

34.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the DEVICES described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

/s/ Davide M. Gomes
Davide M. Gomes
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone
on July 8, 2021:

s/Robert M. Levy

HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

28

## ATTACHMENT A

The property to be searched are: (a) a beige with gold trim Apple iPhone 12 Pro Max in black case, model A2342, IMEI 353167661065250; and (b) a gray Apple iPhone 11 Pro Max, Model A2161, IMEI 3528471116944384 (hereinafter the "DEVICES")  The DEVICES are currently in FBI's custody in the Eastern District of New York.

This warrant authorizes the forensic examination of the DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the DEVICES for all records on the DEVICES described in Attachment A that relate to violations of 18 U.S.C. § 922(g)(1) from October 1, 2020 to June 25, 2021, including:

      a.   Evidence, fruits, and instrumentalities of the SUBJECT OFFENSE;

      b.   Evidence concerning the identity of the owner(s) or user(s) of the DEVICES;

      c.   Evidence of firearm or ammunition possession or ownership;

      d.   All communications including telephone logs, text messages, messages sent through applications, and emails regarding firearms or ammunition;

      e.   Photographs, including still photographs, digital images, videos, films, location data, or other items indicating possession of firearms or ammunition by LASTER;

      f.   Any internet or browser entries or history relating to the SUBJECT OFFENSE;

      g.   Any memory cards associated with the DEVICES, which may contain any and all of the above-referenced forms of evidence of the SUBJECT OFFENSE; and

      h.   Any location data indicating the location of the DEVICES for dates on or about October 1, 2020; October 23 to 26, 2020; November 22 to 23, 2020; December 4, 2020; and April 15 to 21, 2021.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.